# UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

**DANIEL L. HALL, SR.,**

  **Plaintiff,**

**v.**              **Case No. 2:14cv91**
                **(Judge Bailey)**

**DALE GRIFFITH, Unit Manager; RYAN
ADDAMS, Case Manager; JIM RUBENSTEIN,
DOC Commissioner; KAREN
PSZCZOLKOWSKI, Warden;
JOANIE HILL, Assistant Warden;
BRANDY MILLER, Assistant Warden;
SHIRLEY HEVERNER, Trustee Clerk;
ROBERT SIMSA, Corrections Officer;
ROBERT FLESHER, Corrections Officer;
BENITA MURPHY, Parole Board Member;
JENNIFER HAYES, Correctional Hearing
Officer; RUSS POWELL, Corrections
Officer; JOSEPH THORNTON, Parole
Board Member; BRENDA STUCKY,
Parole Board Member; and JAMES
COLOMBO, Parole Board Member,**

  **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On November 25, 2014, the *pro se* plaintiff, an inmate at the Northern Correctional Facility ("NCF") in Moundsville, West Virginia, initiated this case by filing a filing a civil rights complaint against the above-named defendants pursuant to 42 U.S.C. §1983. The plaintiff was granted permission to proceed as a pauper on December 17, 2014 and paid his initial partial filing fee on January 23, 2015.

On February 10, 2015, upon a preliminary review of the file, the undersigned determined that summary dismissal was not appropriate, and directed the United States Marshal Service to serve the complaint. On March 3, 2015, defendants James Colombo, Carol Greene, Benita Murphy, Brenda

Stucky, and Joseph Thornton filed a Motion to for Summary Judgment with a memorandum of law in support, and defendants Ryan Addams, Robert Flesher, Dale Griffith, Jennifer Hayes, Shirley Heverner, Joanie Hill, Brandy Miller, Russ Powell, Karen Pszczolkowski, Jim Rubenstein, and Robert Simsa filed a Motion to Dismiss with a memorandum in support. Because plaintiff was proceeding *pro se,* on March 9, 2015, a <u>Roseboro</u> Notice was issued, advising plaintiff of his right to respond to the defendants' dispositive motions. On March 17, 2015, plaintiff filed a motion for appointed counsel and attached copies of more of his grievances. By Order entered March 23, 2015, plaintiff's motion for appointed counsel was denied. Plaintiff did not file a response to the defendants' dispositive motions.

Accordingly, this case is before the undersigned for an initial review and report and recommendation pursuant to LR PL P 2.

## II. <u>Contentions of the Parties</u>

### A. <u>The Complaint</u>

In the complaint, filed without a memorandum in support, the plaintiff alleges that:

1) on August 4, 2014, he was granted parole, but subsequently his parole was rescinded, based on "a letter that had been stolen from my mothers [sic] mail box[.]"[1] He contends that defendant Benita Murphy ("Murphy") "refused to overturn the decision and allow a new hearing," and defendant Joseph Thornton ("Thornton") "refused to respond to my letter asking for help in this matter[.]" He contends that Murphy and Thornton's refusal to intervene on his behalf constitutes "unjust punishment" that was done "in retaliation for my pending lawsuit against DOC[2] and my class 1 write up by Rubensteins [sic] office[.]"[3] Although Plaintiff also alleges this claim against defendants Brenda Stucky ("Stucky"), Carol Greene ("Greene"), and James Colombo ("Colombo"), he makes no specific allegation against them.

2) Defendants Dale Griffith ("Griffith"), Ryan Addams ("Addams"), Robert Simsa ("Simsa"), Robert Flesher ("Flesher"), Russ Powell ("Powell"), Jennifer Hayes ("Hayes"), Karen Pszczolkowski ("Pszczolkowski"), Joanie Hill ("Hill"), and Jim Rubenstein ("Rubenstein")

---

[1] Dkt.# 1 at 7.

[2] The under signed presumes that by "DOC" plaintiff is referring to the West Virginia Division of Corrections ("WVDOC").

[3] Dkt.# 1 at 7.

destroyed his grievances, denied his grievances, gave him 30 days segregation for defending himself, "gave out confidential PREA statement[4] [sic]," and the correctional officers did nothing during his beating or the stealing of his mail.[5] Thus, he alleges, all are guilty of retaliation, deliberate indifference, negligence, and unjust punishment.

3) Defendants Brandy Miller ("Miller"), Pszczolkowski, Hill, Rubenstein, and Shirley Heverner ("Heverner") retaliated against him and violated his First Amendment rights when they refused to permit him to practice his chosen religion by denying six of his yearly feasts, telling him he had to choose just one.

4) Defendants Heverner, Pszczolkowski, Hill and Rubenstein retaliated against him by taking 50% of the money sent to him by outside sources to place in mandatory savings, in direct violation of D.O.C. policy which states that only 10% of earned money can be taken. Further, they refused to give him the ledger sheets to his Prison Trust Account necessary to file *pro se* lawsuits.

5) Defendant Rubenstein retaliated against him by having him written up "on Compromising in Jan 2014 [sic][.]" He alleges that since that time, all of his grievances and appeals have been denied by all D.O.C. staff, his money is being taken, and the Correctional Officers ("C.O.s") are not protecting him from assault, "even though I was sent to this facility for protection."[6]

Plaintiff describes his damages as "First Amendment Rights violated, jaw broken, mail stolen, my right to file grievances taken away by warden, unit manager, constitutional right to self defence [sic] taken by DOC staff, Im [sic] being tortured and DOC Commissioner denies all grievances I send so I don't get any help."[7]

The plaintiff maintains that he has exhausted his administrative remedies with regard to these claims.

As relief, plaintiff seeks $100,000.00 from each "retaliating DOC staff member . . . $100,000 from each retaliating parole board member[, and] $100,000 from DOC Commissioner Jim Rubenstein." Plaintiff also seeks injunctive relief in the form of "immediate discharge from DOC custody."[8]

---

[4] The undersigned presumes that by "PREA," plaintiff is referring to the Prison Rape Elimination Act.

[5] Dkt.# 1 at 8.

[6] Dkt# 1 at 8.

[7] Id. at 9.

[8] Dkt.# 1 at 9.

**B. Defendants Addams, Flesher, Griffith, Hayes, Heverner, Hill, Miller, Powell, Pszczolkowski, Rubenstein, and Simsa's Motion to Dismiss**

In their memorandum in support of their motion to dismiss, the defendants Addams, Flesher, Griffith, Hayes, Heverner, Hill, Miller, Powell, Pszczolkowski, Rubenstin and Simsa argue that the plaintiff's complaint should be dismissed for the failure to state a claim upon which relief may be granted. In support of that argument, the defendants assert:

1) allegations based on *respondeat superior* in defendants in their official capacities are not permitted under 42 U.S.C. §1983;

2) plaintiff's allegations against defendants are threadbare recitals of elements of a cause of action supported by conclusory allegations and are not entitled to the presumption of truth;

3) the plaintiff has not alleged sufficient facts to state a claim of deliberate indifference;

4) plaintiff has not alleged sufficient facts to state a claim of retaliation and unjust punishment; and

5) defendants are entitled to qualified immunity.

**C. Defendants Colombo, Greene, Murphy, Stucky, and Thornton's Motion for Summary Judgment**

In their memorandum in support of their motion for summary judgment, the defendants Colombo, Greene, Murphy, Stucky, and Thornton argue that the summary judgment should be granted in their favor, dismissing plaintiff's complaint for its failure to state a claim upon which relief may be granted. In support of that argument, the defendants assert:

1) defendants did not retaliate against plaintiff in any way in the rescission of his parole; rather, his parole was rescinded for just cause.

## III. Standard of Review

**A. Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright

& Arthur R. Miller, Federal Practice and Procedure §1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," Id. (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

## B.    Motion for Summary Judgment

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."    Fed.R.Civ.P. 56(c).    In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).    The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id.  This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but  . . .  must set forth specific facts showing that there is a genuine issue for trial."  Anderson at  256.  The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment.  Id. at 248.    Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."  Matsushita, at 587 (citation omitted).

## IV. Analysis

Title 42 U.S.C. §1983 provides as follows:

Every  person  who,  under  color  of  any  statute,  ordinance,  regulation,  custom,  or usage,  of  any  State  or  Territory  or  the  District  of  Columbia,  subjects,  or  causes  to  be subjected,  any  citizen  of  the  United  States  or  other  person  within  the  jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Therefore, in order to state a claim under 42 U.S.C. §1983, the plaintiff must demonstrate that a person acting under color of state law deprived him of the rights guaranteed by the Constitution or federal laws. Rendall-Baker v. Kohn, 547 U.S. 830, 838 (1982)

This Court is required to liberally construe *pro se* complaints. Erickson v. Pardus, 551 U.S. 89, 94 (2007); see also Haines v. Kerner, 404 U.S. 519, 520 (1972); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978). Such *pro se* complaints are held to a less stringent standard than those drafted by attorneys. Erickson, *supra* at 94; Gordon v. Leeke, *supra* at 1151, and a federal district court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case. Hughes v. Rowe, 449 U.S. 5, 9 (1980); Cruz v. Beto, 405 U.S. 319 (1972). When a federal court is evaluating a *pro se* complaint, the plaintiff's allegations are assumed to be true. Erickson, 551 U.S. at 93 (*citing* Twombly, 550 U.S. at 555-56). Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. See Weller v. Dep't. of Social Srvcs., 901 F.2d 387 (4th Cir. 1990); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009)(outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions"). The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so; however, a district court may not rewrite a complaint to include claims that were never presented, Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999), construct the plaintiff's legal arguments for him, Small v. Endicott, 998 F.2d 411 (7th Cir. 1993), or "conjure up questions never squarely

presented" to the court, <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274, 1278 (4th Cir. 1985). Finally, although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996). <u>See also</u> <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d 754, 764 (4th Cir. 1990).

**A. <u>Interference with Filing of Grievances</u>**

**<u>Defendants Griffith, Addams, Simsa, Flesher, Powell, Hayes, Pszczolkowski, Hill and Rubenstein</u>**

The plaintiff's complaint alleges that defendants Griffith, Addams, Simsa, Flesher, Powell, Hayes, Pszczolkowski, Hill and Rubenstein destroyed his grievances and/or denied them. Apparently in purported support of this claim, he avers that "<u>every</u> grievance, no matter what its [sic] about is denied, every appeal, denied, even when it clearly shows civil, constitutional rights violations."[9]  He attaches a copy of an October 24, 2014 grievance he filed, complaining about the response times to various grievances filed,[10] not the claim he makes here.[11]

Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. <u>See</u> <u>Dale v. Lappin</u>, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a <u>Bivens</u>[12] suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading

---

[9] Dkt.# 1 at 5.

[10] Plaintiff raised a very similar claim in an earlier §1983 action, Case No. 5:14cv150, filed against defendants Pszczolkowski, Powell, Hill, Griffith, Simsa, Flescher, and Hayes on November 14, 2014, eleven days before the instant case, wherein he alleged that defendant Griffith did not receive his grievances about an incident "and now it was to [sic] late to file one;" and that his level one grievance "disappeared, after being taken by an officer from my cell door in segregation, now I'm being told its [sic] to [sic] late to file another.  But I have anyway and to date have not received responce [sic]." On August 3, 2015, in a Report and Recommendation, Case No. 5:14cv150 was recommended for dismissal for failure to state a claim and as frivolous.

[11] Dkt.# 1-9 at 1 – 2.

[12] Case law under 42 U.S.C. §1983 is applicable to <u>Bivens</u> actions.  <u>See</u> <u>Butz v. Economou</u>, 438 U.S. 478, 504 (1978).

and proving." (citations omitted)); Walsh v. Berkebile, 2011 U.S. Dist. LEXIS 43914, *16, 2011 WL 1547908 (S.D. W. Va. Feb. 22, 2011).

Here, plaintiff has not even attempted to identify which of the named defendants allegedly "destroyed" his grievances; which grievances were destroyed; when or how they were destroyed; or why they were. Moreover, to the extent that the plaintiff may be asserting that any of these defendants violated his constitutional rights by denying his administrative grievances, that claim is without merit, because that is not the type of personal involvement required to state a Bivens claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003). Accordingly, in addition to being insufficiently-pled, because here, the defendants have not even alleged that plaintiff failed to exhaust his administrative remedies to preclude a review of his claims on their merits, even if plaintiff's claims were true, plaintiff clearly has suffered no harm as a result. Finally, because it is apparent that the defendants have not interfered with his bringing these claims, this claim, like plaintiff's claim of interference with his administrative remedies in Case No. 5:14cv150, is also moot and will not be given review.

**B) Unjust Punishment and/or Retaliation**

**Defendants Murphy, Thornton, Stucky, Greene, and James Colombo**

Plaintiff alleges that after his August 4, 2014 parole decision was rescinded because of a letter purportedly stolen from his mother's mail box, defendant Murphy refused to overturn the decision to permit a new hearing, and defendant Thornton refused to respond to his letters asking for help in the matter. He contends that Murphy and Thornton's refusals in this regard constitute "unjust punishment," which was done in retaliation for his pending lawsuit against the WVDOC and a "class 1 write up" by defendant Rubenstein. Although Plaintiff only makes specific allegations against defendants Thornton and Murphy with regard to this claim, he also names defendants Stucky, Greene, and James Colombo as being involved; his complaint identifies these five defendants as parole board members.

Despite the fact that defendants Murphy, Thornton, Stucky, Greene and Columbo identify defendant Thornton as the Cabinet Secretary for West Virginia Department of Military Affairs and Public Safety ("WV DMAPS") and not a member of the West Virginia State Parole Board, these defendants will be referred to herein as "the parole defendants." The parole defendants deny having retaliated against plaintiff in any way in the rescission of his parole, averring that plaintiff's parole was rescinded for just cause. In support, they attach a copy of an August 13, 2014 email to one Travis W. Hayes[13] with the subject line "threatening letters" and the sender's name redacted."[14] The parole defendants state that the Parole Board received the "email containing images of various letters of correspondence Plaintiff Hall wrote to his mother from July 30, 2014, to August 5, 2014, the day he was granted parole."[15] The text of that email states

> Here is the letter we discussed. As you can see he wrote this after he was paroled. I hope this revokes his parole and he has to finish his time, as this is not the only letter he has written threatening one or the other of us. He clearly has not changed with his time in prison and he is just as mean and vindictive as he ever was. Maybe a few more years would help and i [sic] certainly hope he does not receive parole from federal that sets him loose any sooner. He says he goes to church and plays the good boy, but as you can read, he is far from that. Thank you for your time. *[remainder redacted]*

Dkt.# 15-1 at 1. Defendants also attach a rambling, fourteen-page, profanity-laden letter from plaintiff to his mother, handwritten on legal pad. The letter begins on July 30, 2014 and ends on August 5, 2014. In it, plaintiff repeatedly threatens multiple people, stating, *inter alia:*

---

[13] The sender of the email appears to be someone who has been threatened by plaintiff in the past, thus it is unclear how the sender of the email came to be in possession of the letter from plaintiff to his mother, referenced in the email as being attached. The parole defendants do not explain this, nor do they explain who Travis W. Hayes is or his connection to the West Virginia State Parole Board.

[14] The state sentence plaintiff is presently serving on charges of incest is to be followed by a consecutive 36-month federal sentence, issued in Case No. 3:09cr187 in the Southern District of West Virginia for conviction on charges of mailing threatening communications and witness tampering, apparently to "more than twenty individuals who were prospective jurors in a pending state criminal action in which Hall was a defendant. The letter suggested that members of the jury would be in danger of physical harm. Consequently, several recipients of the letter refused to appear for jury duty. As a result, Hall's [state] trial had to be rescheduled." See Proposed Findings and Recommendations in plaintiff's §2255 proceedings (S.D. W.Va. Dkt.# 86 at 1-2 and 8)(3:12cv1039) (internal citations removed)(adopted by Dkt.# 89, Mem. Opinion and Order, entered May 31, 2013).

[15] Dkt.# 16 at 3.

. . . They waited till I may be getting out then they wanna start shit and cause trouble, where they think I been Mommy? Summer camp. They think I'm rehabilitated, I'm a perfect little angel now? All this time done is make me more sinicle [sic], I'm me, but worse than ever. It's all good. We'll deal with it when I get out. WATCH and see they act like I'm a lifer and I'll never be face to face with them again. Those mother fuckers. Can't do this time. Gale is gonna kill me. Oh I'm so scared. Motherfucking pussy ass bitch ain't got no ball [image cut off/illegible], never did have, John paying Rick to say shit? Like he paid Gale to burn down my trailer, ain't forgot that, ain't going to . . . I'm gonna get out and I'm gonna be a holy terror, watch. I done been pushed to [sic] far, the most at this point I can stay locked up is roughly 4 ½ years if I gotta discharge both sentences, I'm not gonna be down for long, I will be out and worse than ever. Pissed off at the world. I already did 5 years 4 months, another 4 ½ max ain't gonna kill me. Why do assholes wanna run there [sic] fucking mouths when I'm 6 hrs away and locked behind the walls[.]

Dkt.# 15-1 at 2 – 4.

On August 2, 2014, Plaintiff went on to tell his mother "I need a change. If I don't change, I'm gonna get out and do something stupid, and end up back here again, maybe forever, you know how my temper gets the best of me." Id. at 10.  On August 3, 2014, he wrote

I got that class on Monday, at 12:45. Don't know if I'll complete it, but I'm gonna go see what its [sic] about anyhow, if it's stupid I ain't doing it, but at least it's on paper I signed up for classes, that shows I'm trying to better myself, maybe that will play in my favor with the Board.

Id. at 12.   On August 4, 2011, discussing his pending parole decision, Plaintiff wrote

if they turn me down, I'm gonna go ahead and file a lawsuit against them over Education, and Religeon [sic] and take part of NCF's money to [sic]. I'm not going to stop till I get part of MOCC's [sic] may as well take my part of this places [sic] to [sic] . . . Hey I'm back. Fuck all them whores. Jenny better mind her goddamned business. She keeps my mail from you again and it's a wrap for that cunt."

Id. at 13. Finally, the parole defendants attach a copy of an August 25, 2014 letter from defendant Benita Murphy, Chairperson, West Virginia State Parole Board, to the plaintiff, stating in pertinent part that

[o]n August 5, 2014 you were granted parole.  Since that time; new information regarding your case has been received.  This is grounds upon which the Board may rescind your parole.  Take notice that the Board herewith temporarily rescinds your parole pending a hearing on the matter. . . at the Northern Correctional Facility on September 5, 2014 . . . to determine if permanent rescission is warranted.

Dkt.# 15-2.

Inmates' retaliation claims are treated "with skepticism because every act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (internal quotations omitted). Additionally, "a plaintiff alleging that government officials retaliated against her in violation of her constitutional rights must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights." American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993). Therefore, to prevail on a retaliation claim, an inmate must specifically demonstrate that but for his protected conduct, he would not have been subject to the alleged retaliatory act. See Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). Essentially, an inmate must first demonstrate that he engaged in protected conduct and second that his protected conduct motivated the retaliatory act. Powers v. Fed. Bureau of Prisons, 2012 U.S. Dist. LEXIS 101698, *58-59 (S.D. W.Va. May 23, 2012).

Here, the plaintiff merely makes conclusory and self-serving allegations of retaliation. He provides no specific facts in support of such a claim and absolutely no evidence to support even a *prima facie* case of retaliation. He fails to identify any constitutionally protected right he was exercising or any motive for such alleged retaliatory acts. Plaintiff's claims are vague, insufficiently pled, and fail to rise to the level of constitutional claims. Moreover, a review of the plaintiff's correspondence with his mother makes it plain that the parole rescission was not "unjust" punishment. West Virginia Code §62-12-13(b)(4) states that "any inmate of a state correctional institution is eligible for parole if he or she: has satisfied the board that if released on parole he or she will not constitute a danger to the community." It is clear that plaintiff's parole rescission was warranted and that there was just cause, given plaintiff's apparent continuation of the same threatening behavior that earned him his pending 36-month federal sentence. Accordingly, this claim

has no merit, is frivolous, malicious, fails to state a claim upon which relief can be granted, and should be dismissed.

### **Defendants Pszczolkowski, Hill and Rubenstein**

Next, plaintiff includes defendants Pszczolkowski, Hill and Rubenstein in a blanket claim of unjust punishment and retaliation, presumably for giving him 30 days segregation for defending himself; disclosing a confidential PREA statement;[16] stealing mail,[17] and/or for the correctional officers doing "nothing" during his beating. He does not specify which defendant committed which acts, or how, when, or why the acts were committed. Plaintiff makes a further retaliation claim against only defendant Rubenstein, for having him "wrote up on Compromising[18] in Jan 2014," and

---

[16] This claim was also raised in Case No. 5:14cv150.

[17] This is the sum total of this claim, a bare allegation of "stealing mail," made without identifying who stole it; what mail was stolen; or when, how or why it was stolen. Although nowhere stated by the plaintiff, the undersigned speculates that it appears this claim may be directed at the letter he sent to his mother that ended up being used by the WV State Parole Board to rescind his parole. If so, from the context of the accompanying email, it seems likely that the person who intercepted the letter was a third party and not one of the named defendants. Nonetheless, even if plaintiff's mail was "stolen" by being opened and/or read by one of the named defendants, plaintiff has not alleged that any particular named defendant stole it and thus the claim fails as a matter of law. Finally, pursuant to WVDOC Policy Directive 503.00(III), all written communications and letters, outgoing and incoming, which are not privileged mail (i.e., mail to/from courts, counsel, WVDOC officials; state and local Chief Executive Officers; administrator/designee of the DOC's Inmate Grievance System; and members of the WV Board of Probation and Parole), "may be opened, inspected for contraband, and read." Further, the WVDOC may randomly inspect and read outgoing general correspondence. See WVDOC Policy Directive 503(V)(C)(2)(a). An inmate has no First Amendment privacy interest in their mail unless it is legal mail. Procunier v. Martinez, 416 U.S. 396, 403 - 404 (1974). Stroud v. United States, 251 U.S. 15 (1919)(no Fourth Amendment violation when an inmate's letter containing incriminating material was intercepted by prison personnel and later introduced against him at trial, because the letters came into the possession of prison officials under established practice, reasonably designed to promote institutional discipline).

[18] WVDOC Policy Directive 325.00(V)(A)(1)(y) defines offense 1.25 - Compromising an Employee:

> No inmate shall aid, abet, incite, encourage, or otherwise attempt to aid, abet, incite, or encourage any employee of the West Virginia Regional Jail and Correctional Facility Authority or the West Virginia Division of Corrections, or any employee of any entity contracting with the West Virginia Regional Jail and Correctional Facility Authority or West Virginia Division of Corrections and/or any volunteer to engage in violations of the West Virginia Regional Jail and Correctional Facility Authority's or the West Virginia Division of Corrections' policies and procedures, jeopardize security, engage in poor work performance, or otherwise violate applicable laws or regulations.

alleges that since that time, all his grievances have been denied, his money has been taken, and the C.O.s are not protecting him, despite the fact that he was "sent to this facility for protection."[19]

To the extent that plaintiff is suing defendants Pszczolkowski, Hill, and Rubenstein in their individual capacities, he fails to state a claim. In order to establish personal liability against a defendant in a §1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977).

The plaintiff does not allege any personal involvement by defendants Pszczolkowski, Hill and Rubenstein in his receiving 30 days segregation for defending himself;[20] disclosing a confidential PREA statement;[21] stealing mail; or for the correctional officers doing "nothing" during his beating. Further, he does not specify which acts, if any, Pszczolkowski, Hill and Rubenstein were actually involved in and provides no detail as to any of the claims; he merely lists a group of defendants' names, of which Pszczolkowski, Hill and Rubenstein are included; lists a group of claims; and then lists a group of allegedly wrongful acts committed without specifying who did what, when, where or why. His only "allegation" regarding Pszczolkowski's involvement is on previous pages of the

---

[19] Dkt.# 1 at 8.

[20] It appears that plaintiff is again raising another claim from Case No. 5:14cv150, regarding the denial of his right to self-defense. In that case, he alleged that defendant Pszczolkowski, as the acting warden, was responsible for staff's actions and her refusal to "overturn my appeal for write up for" the September 4, 2014 fight in the recreation yard.

[21] Although not specifically stated by plaintiff in the instant complaint, this, too, appears to be another claim already raised in Case No. 5:14cv150. There, plaintiff alleged that on June 30, 2014, he made a confidential sexual harassment complaint about another inmate to defendant Griffith, his Unit Manager, but that instead of keeping the matter confidential, Griffith "passed off" the complaint to defendant Powell, instead of dealing with it himself. Plaintiff alleges that Powell then called his "harasser" to the office and told him about plaintiff's complaint, including who filed it. He alleges that his "harasser" then paid another inmate to assault him on the recreation yard on September 4, 2014.

complaint, where he alleges that Pszczolkowski is the Warden; Hill is the Assistant Warden; and Rubenstein is the Acting Commissioner of the Division of Corrections.[22]

When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 F.2d 1113 (4th Cir. 1982); Orum v. Haynes, 68 F.Supp.2d 726 (N.D. W.Va. 1999), or the following elements are met: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and (3) there was an affirmative causal link between the supervisors inaction and the particular constitutional injuries suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

To the extent that the plaintiff may be asserting that defendants Pszczolkowski, Hill and Rubenstein retaliated against him by meting out "unjust punishment," either by giving him 30 days segregation for defending himself; disclosing a confidential PREA statement; stealing his mail; or for turning a blind eye to the correctional officers' alleged failure to intervene during his beating, any such claims are conclusory and self-serving allegations of retaliation. Plaintiff has provided no specific facts in support of any of these claims and absolutely no evidence to support even a *prima facie* case of retaliation. He fails to identify what constitutionally protected right he was exercising or to identify any plausible motive for such alleged retaliatory acts. His claims are vague, insufficiently pled, and fail to rise to the level of a constitutional claim. The claims fail to assert credible allegations to support a finding that the elements necessary to establish supervisory liability

---

[22] Dkt.# 1 at 2 and 4.

against Pszczolkowski, Hill and Rubenstein are present. Accordingly, any claim he might have of unjust punishment and retaliation against them fails to state a claim upon which relief can be granted.

As for plaintiff's other retaliation claim against only defendant Rubenstein for having him "wrote up on Compromising in Jan 2014," this claim has no merit, because while Rubenstein, as the Commissioner of the West Virginia Division of Corrections, conceivably could have been involved in a Level 3 denial of an inmate's grievance appeal, he would never have been involved in having any inmate initially "written up."[23] Accordingly, this claim not only fails to state a claim upon which relief can be granted, it is frivolous and malicious as well.

### Defendants Griffith, Addams, Simsa, Flesher, Powell, and Hayes

Plaintiff alleges that defendants Griffith, Addams, Simsa, Flesher, Powell, and Hayes also participated in unjust punishment and retaliation, presumably for giving him 30 days segregation for defending himself; disclosing a confidential PREA statement; stealing mail, and/or for the correctional officers doing "nothing" during his beating.  Again, he does not specify which acts Griffith, Addams, Simsa, Flesher, Powell, and Hayes were actually involved in, nor does he provide any detail as to any of the claims; he merely lists the defendants' names; the claims against them; and lists a group of allegedly wrongful acts committed. His only "allegation" regarding Griffith, Addams, Simsa, Powell and Hayes' involvement is on previous pages of the complaint, where he alleges that Griffith is  a Unit Manager; Addams is a Case Manager; Simsa and Flesher are correctional officers; Powell is an Acting Sargent; and Hayes is a Correctional Hearing Officer.

To the extent that the plaintiff may be asserting that either any or all of defendants Griffith, Addams, Simsa, Flesher, Powell, and Hayes retaliated against him by meting out "unjust

---

[23] The WVDOC has a three level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues.  The first level involves filing a G-1 Grievance Form with the Unit Supervisor.  If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator.  Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

punishment," either by giving him 30 days segregation for defending himself; disclosing a confidential PREA statement; stealing his mail; or for turning a blind eye to the correctional officers' alleged failure to intervene during his beating, any such claims are conclusory and self-serving allegations of retaliation. They fall far short of the "heightened pleading standard" required in actions against government officials.[24] The undersigned agrees with the defendants' characterization of plaintiff's allegations as "threadbare recitals of elements of a cause of action supported by conclusory allegations and are not entitled to the presumption of truth." Plaintiff has not bothered to provide specific facts in support of any of his claims and has set forth no evidence to support even a *prima facie* case of retaliation. He fails to identify the constitutionally protected right he was exercising or to identify any plausible motive for such alleged retaliatory acts. His claims are vague, insufficiently pled, and fail to rise to the level of a constitutional claim. Accordingly, any claim he might have of unjust punishment and retaliation against these defendants fails to state a claim upon which relief can be granted.

### Defendants Heverner, Pszczolkowski, Hill and Rubenstein

Plaintiff next alleges that defendants Heverner, Pszczolkowski, Hill and Rubenstein further retaliated against him by taking 50% of the money sent to him by outside sources to place in mandatory savings, in direct violation of D.O.C. policy which states that only 10% of earned money can be taken. Further, he alleges that they refused to give him the ledger sheets to his Prisoner Trust Account, necessary to file *pro se* lawsuits. In support, he attaches a copy of a January 23, 2013 memo from Warden David Ballard regarding Mandatory Savings[25] and what appears to be part of a letter from defendant Shirley Hevener, Trustee Clerk, stating that

> [y]ou saw the parole board in August 2014. That means you are subject to Policy
> Directive 457.09, which allows the Warden or her Designee to withhold funds from

---

[24] <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996). <u>See</u> <u>also</u> <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d 754, 764 (4th Cir. 1990).

[25] Dkt.# 1-10 at 2.

your account regardless of where those funds came from. According to Policy Directive 457.09, the Warden has the authority to withhold funds from your account in order to ensure you have transportation upon your discharge or parole. In Part V, Section B, it states "In order to ensure that each inmate has sufficient funds to purchase an [sic] one-way bus, conveyance, or common carrier ticket, the Warden/Administrator/designee, within twelve (12) months of his/her projected minimum discharge date or within three (3) months of his/her first parole eligibility date and all times thereafter, shall take all measures to ensure that the inmate has in his/her mandatory savings account a sum sufficient to purchase a bus, conveyance, or common carrier ticket in accordance with this policy.

Please note that the policy specifically states that the funds will be taken upon your FIRST parole eligibility date and all times thereafter, the deductions from your account will continue until you have reached the $100.00 amount.

Dkt.# 1-10 at 3.

The defendants Griffith, Addams, Rubenstein, Pszczolkowski, Hill, Miller, Hevener, Simsa, Flesher, Hayes and Powell's Motion to Dismiss fails to address this claim. Nonetheless, West Virginia Division of Corrections Policy Directive 457.09, dated July 1, 2012, states in pertinent part:

B. In order to ensure that each inmate has sufficient funds to purchase an [sic] one-way bus, conveyance, or common carrier ticket, **the Warden/ Administrator/designee, within twelve (12) months of his/her projected minimum discharge date or within three (3) months of his/her first parole eligibility date and all times thereafter, shall take all measures to ensure that the inmate has in his/her mandatory savings account a sum sufficient to purchase a bus, conveyance, or common carrier ticket in accordance with this policy**.

l. **If necessary the Warden/Administrator/designee may place a hold on an inmate's spending and transfer an appropriate amount of money from the inmate's spending account to his/her mandatory savings account in order to pay the above-noted transportation costs** when he/she is released by discharge of sentence or pursuant to parole.

WVDOC Policy Directive 457.09(V)(B)(1). (emphasis added).

A review of the WVDOC's online Offender Search indicates that plaintiff's "next parole hearing" is still listed as having been August 1, 2015.[26] Therefore, it is apparent that any moneys in excess of 10% being transferred from plaintiff's Prison Trust Account into his mandatory savings account at this time are being deducted "within three (3) months of his/her first parole eligibility date

---

[26] Plaintiff's projected release date is listed as January 5, 2017.

and all times thereafter," and not for any retaliatory purpose. Moreover, because plaintiff has not only failed to allege that the defendants retaliated against him in violation of his constitutional rights, he has not demonstrated that he suffered any adversity in response to his exercise of protected rights,"[27] he has failed to state a retaliation claim upon which relief can be granted.

Finally, as for plaintiff's claim that the defendants have refused to give him the ledger sheets from his Trust Account necessary for filing *pro se* lawsuits, a PACER search performed on September 14, 2015 reveals that in the less-than-ten-months between November 14, 2014 and September 4, 2105, plaintiff has managed to file no less than 13 civil actions, both in this district and in the Southern District of West Virginia; at times, he has filed two and three case in the same day. Thus, this claim not only lacks merit, it is frivolous and malicious as well.

## C) Deliberate Indifference/Failure to protect

In this claim, plaintiff appears to be raising yet another claim already raised Case No. 5:14cv150, wherein he alleged that on September 4, 2014, he was attacked on the NCF recreation yard by another inmate, S.P., and the two correctional officers who were assigned to patrol the recreation yard that day did nothing to intervene, permitting him to be "brutally assaulted" by being stabbed in the forehead, sustaining a black eye, a broken tooth, bruised ribs, and a broken jaw. However, here, plaintiff's instant complaint does not even actually allege that he was assaulted or provide any details about an assault; it merely alleges that the defendants Griffith, Addams, Simsa, Flesher, Powell, Hayes, Pszczolkowski, Hill and Rubenstein were deliberately indifferent for "destroying grievances, denying grievances, given 30 days segregation for self-defence [sic], gave out confidential PREA statement, co's did nothing during my beating, stealing mail."[28] Elsewhere, in a claim against only defendant Rubenstein for retaliation, he alleges that "co's [sic] are not protecting

---

[27] American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md., 999 F.2d at 785.

[28] Dkt.# 1 at 8.

me from assault[.]"[29] However, in copies of grievances attached to his complaint, it is apparent he is again complaining of the September 4, 2014 assault by inmate S.P. on the NCF recreation yard; he denies having fought back "because I was 1 day . . . from seeing the parole board;"[30] and contends that it was not until S.P. broke his jaw and stabbed and hit him "at least 10 times" before he grabbed S.P.'s arm "out of pure desperation to stop the assault."[31] He describes his injuries as a broken jaw that "will take months to heal and will never heal correctly[.]"[32] Further, he alleges that the "yard officers made no attempt to help me but simply left me to die at the hands of another inmate[.]"[33] Although nowhere apparent from the instant complaint, a review of the complaint filed in Case No. 5:14cv150 reveals that defendants Simsa and Flescher were the C.O.s working the recreation yard the day of the assault.

In order to state an Eighth Amendment claim of failure to protect, the plaintiff must show that prison officials violated their duty to protect him "from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference" to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. at n. 3. However, the Supreme Court held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of

---

[29] Dkt.# 1 at 8.

[30] Dkt.# 1-3 at 2.

[31] Dkt.# 1-3 at 1.

[32] Dkt.# 1-3 at 2.

[33] Dkt.# 1-1 at 1.

confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837.

**Defendants Pszczolkowski, Hill and Rubenstein**

Again, to the extent that plaintiff is suing defendants Pszczolkowski, Hill and Rubenstein in their individual capacities, he again fails to state a claim. In order to establish personal liability against a defendant in a §1983 action, the defendant must be personally involved in the alleged wrong(s); liability cannot be predicated solely under *respondeat superior*. See Monell v. Department of Social Services, 436 U.S. 658 (1978); Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977). The plaintiff does not allege any personal involvement by defendants Pszczolkowski, Hill and/or Rubenstein in any assault. Moreover, his complaint does not even allege that he was assaulted or provide any details about it at all; it merely makes the blanket allegation that the defendants Pszczolkowski, Hill and Rubenstein were deliberately indifferent for the same group of offenses: "destroying grievances, denying grievances, given 30 days segregation for self-defence [sic], gave out confidential PREA statement, co's did nothing during my beating, stealing mail."[34] He has not alleged that Pszczolkowski, Hill and/or Rubenstein had any actual or constructive knowledge that their subordinates were engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; that Pszczolkowski, Hill and/or Rubenstein's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and there was an affirmative causal link between Pszczolkowski, Hill and/or Rubenstein's inaction and the particular constitutional injuries suffered by the plaintiff.[35] To the extent that the plaintiff may be asserting that defendant Pszczolkowski, Hill

---

[34] Dkt.# 1 at 8.

[35] Shaw v. Stroud, 13 F.3d at 799.

or Rubenstein were deliberately indifferent to his safety by denying any administrative grievances he filed over the incident, again, any such claim is without merit, because that is not the type of personal involvement required to state a claim.  <u>See</u> <u>Paige v. Kuprec</u>, *supra* at 2003 W.L. 23274357 *1.

A careful review of the plaintiff's complaint establishes that he has he failed to assert credible allegations to support a finding that the elements necessary to establish supervisory liability against Pszczolkowski, Hill and Rubenstein are present. Accordingly, then, any claim he might have of deliberate indifference against them fails to state a claim upon which relief can be granted.

### **Defendants Griffith, Addams, Simsa, Flesher, Powell, and Hayes**

Here, again without providing any specific detail, plaintiff makes the blanket allegation that the defendants Griffith, Addams, Simsa, Flesher, Powell, and Hayes were deliberately indifferent for the same group of offenses: "destroying grievances, denying grievances, given 30 days segregation for self-defence [sic], gave out confidential PREA statement, co's did nothing during my beating, stealing mail."[36]

This claim, like most of the rest of plaintiff's other claims, is merely a list of defendants accompanied by a laundry list of claims and a list of allegedly wrongful acts, set forth without identifying which defendants committed them; which did not; or how, where and when the acts occurred. While *pro se* filers are entitled to liberal construction, this in no way meets the "heightened pleading standard" required in actions against government officials.[37]  District courts are not required "to conjure up questions never squarely presented to them." <u>Beaudett v. City of Hampton</u>, 775 F.2d at 1278, (adding that "[d]istrict judges are not mind readers").  This claim, likewise, is so insufficiently pled it fails to state a claim upon which relief can be granted and should be dismissed.

### **D) Negligence**

---

[36] Dkt.# 1 at 8.

[37] <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996).

Next, plaintiff contends that defendants Griffith, Addams, Simsa, Flesher, Powell, Hayes, Pszczolkowski, Hill and Rubenstein were negligent, presumably for the same group of offenses: destroying and/or denying his grievances; giving him 30 days segregation for self-defense; giving out a "confidential PREA statement;" stealing his mail; and for the C.O.s doing nothing during his beating. Plaintiff provides no detail to allege which defendant committed which wrongful act, when, where, how or why. He merely list defendants' names accompanied by a laundry list of claims and a laundry list of wrongful acts he contends were committed. By law, the undersigned is not permitted to speculate as to plaintiff's claims.[38] Again, plaintiff has failed to state a claim upon which relief can be granted and this claim, too, should be dismissed.

**E) <u>Retaliatory Denial of First Amendment right to practice chosen religion</u>**

Plaintiff contends that defendant Assistant Wardens Hill and Miller, Warden Pszczolkowski, D.O.C. Commissioner Rubenstein, and Trustee Clerk Heverner retaliated against him by refusing to permit him to practice his chosen religion, when they denied him the opportunity to celebrate six of his yearly Zoroastrian religious feasts, telling him he had to choose one.

Plaintiff's complaint, filed without any memorandum in support, does not elaborate on this claim or even identify what his "chosen religion" is. However, attached to it is a copy of an October 24, 2014 administrative remedy, Grievance 14-NCC-C2-980, complaining of being denied the right to have six days of religious feasts "as required for the practice of the ZoroAstrian [sic] Faith."[39] More detail can be gleaned from the copy of a grievance attached to plaintiff's later-filed motion for appointed counsel, where, as relief, he demands "immediate discharge" from WVDOC custody for this alleged violation of his First Amendment rights. In this grievance, plaintiff complains that while he is denied his right to his six feasts, Odinist, Krisna [sic], Pentecostal, Catholic, Muslim, and

---

[38] <u>Beaudett v. City of Hampton</u>, 775 F.2d at 1278, ("[d]istrict judges are not mind readers").

[39] Dkt.# 38-1 at 7.

inmates who participate in Bible studies are permitted to have religious services every week; he notes

that he is the only Zoroastrian at NCF and asks "how hard could it be to accommodate a one man

feast?"[40]   The response to the grievance was provided by defendant Assistant Warden Miller (then

Associate Warden of Programs) and states in pertinent part:

> . . . When considering religious accommodation requests there is a set of analysis [sic] that needs to be followed.
>
> 1.   What is the inmate's sincerely held religious belief? This needs to first be addressed so as to resolve the next question.
>
> 2. Does the rule in question, whether one of general application or other restriction, impose a substantial burden upon the exercise of his religion?  A substantial burden has been held to occur whenever "a state of [sic] local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."
>
> 3.   If a substantial burden exists is there a compelling governmental interest that is furthered by the restriction?
>
> 4. If there is a compelling interest, then it must be determined whether a less restrictive alternative exists to the need.
>
> The Religious Services Committee reconsidered this matter in light of the above stated four (4) factors.  Your religious belief is Zorastrianism.  WV DOC Policy Directive # 511.00 Religious Special Diet, page 4, F Special Occasions states "Declared members of a specific faith group may rqeuqest one special meal observance per year." You are currently in discussion with the institutional Chaplain regarding the scheduling of an upcoming special meal observance per your request via a grievance (see Grievance # 14-NCC-C1-906).   Therefore your grievance is denied.

Dkt.# 38-1 at 8.

### **First Amendment: Free Exercise of Religion Clause Violation**

Prisoners retain their constitutional rights to freedom of religion pursuant to the First

Amendment. See Turner v. Safley, 482 U.S. 78, 84 (1987) (stating that "[p]rison walls do not form a

barrier separating prison inmates from the protections of the Constitution."). As such, prisoners must

be given "reasonable" opportunities to practice their religion. Cruz v. Beto, 405 U.S. 319, 322

---

[40] Dkt.# 38-1 at 7.

(1972). However, the Supreme Court has further cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration." Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (*citing* Procunier v. Martinez, 416 U.S. 396, 405 (1974)). Thus, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration." Id. (*citing* O'Lone v. Estate of Shabazz, 482 U.S. 342, 349-50 (1987); Turner, 482 U.S. at 84-85).

In order to achieve this deference, in part, the Supreme Court revisited the level of scrutiny applied to constitutional claims raised by people currently incarcerated. Thus, the Supreme Court held that when an incarcerated person alleges a prison regulation or policy violates their constitutional rights, the "regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89 (defining the appropriate standard as requiring rational basis, not strict scrutiny analysis). In lowering the standard of review, the Court reasoned that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Id.

The Turner court laid out four factors for the court to consider when "determining the reasonableness of the regulation at issue." Id. The test asks: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns. Lovelace, 472 F.3d at 200

(*citing* <u>Turner</u>, 482 U.S. at 89–92 (internal quotation marks and citations omitted)). Therefore, when determining the reasonableness of a prison regulation, the court must apply this four factor <u>Turner</u> test.

### <u>Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc *et seq.*</u>

Plaintiff also implicitly states a statutory claim under the RLUIPA.

Pursuant to the 1993 Religious Freedom Restoration Act ("RFRA"), the "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest." <u>See</u> 42 U.S.C. §2000bb-1(b) (1994). <u>French v. Md. Div. of Corr.</u>, 2013 U.S. Dist. LEXIS 37862 *18 (March 15, 2013). In response to the RFRA, in 2000, Congress enacted RLUIPA "because it found that some prisons have restricted religious liberty 'in egregious and unnecessary ways.'" <u>Lovelace</u>, 472 F.3d at 182 (*citing* 146 Cong. Rec. S7775 (July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy). Thus, the RLUIPA guarantees incarcerated people greater freedom to engage in religious conduct than does the First Amendment. RLUIPA defines "religious exercise" to broadly include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." <u>French</u>, *supra* at *18. According to RLUIPA, a government is prevented from imposing a "substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government demonstrates that the imposition of the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §2000cc-1; <u>see also</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709. 717 (2005) (upholding RLUIPA's constitutionality). In sum, RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." <u>Cutter</u>, 544 U.S. at 718. However, a prisoner's

RLUIPA rights to religious accommodation are not unfettered. RLUIPA mandates "due deference to the experience and expertise of prison and jail administrators." <u>French</u>, *supra* at *18, *citing* <u>Lovelace</u> at 189-90.

When analyzing a claim under RLUIPA, the court must determine whether the government program or activity at issue receives federal financial assistance. <u>See</u> 42 U.S.C. §2000cc-1(b)(1).[41] When analyzing the substance of the claim, the burden of persuasion is on the plaintiff to demonstrate that the "government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. §2000cc-2(b). Under RLUIPA, "religious exercise" is broadly defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc-5(7)(A). Once the court determines whether the plaintiff's claim involves a "religious exercise," then the court must assess whether the burden was "substantial." 42 U.S.C. §2000cc-2(b). The Fourth Circuit followed the Supreme Court's guidance in First Amendment Free Exercise Clause cases and found that "for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" <u>Lovelace</u>, 472 F.3d at 187 (*citing* <u>Thomas v. Review Bd. of Ind. Employment Sec. Div.</u>, 450 U.S. 707, 718, 101 S.Ct. 1425 (1981)).

Once the plaintiff demonstrates that a government practice substantially burdens their exercise of religion, the burden shifts to the defendant to show that the government practice or policy is "the least restrictive means of furthering a compelling government interest." <u>See</u> <u>Id</u>. at 189. When applying the "compelling government interest" standard, the court must consider the "context" of the claim and apply the standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security

---

[41] RLUIPA also applies in a case when "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. §2000cc-1(b)(2).

and discipline, consistent with consideration of costs and limited resources." Id. at 189-90 (*citing* Cutter v. Wilkinson, 544 U.S. 709, 723, 125 S.Ct. 2113 (2005)). The court is to pay particular consideration to security concerns. Id. Moreover, RLUIPA is not meant to "elevate accommodation of religious observances over an institution's need to maintain order and safety." Id.

**Defendants Hill, Miller, Pszczolkowski, Rubenstein, and Heverner**

Plaintiff claims that defendants Hill, Miller, Pszczolkowski, Rubenstein, and Trustee Clerk Heverner retaliated against him by refusing to permit him to practice his chosen religion when they denied him the opportunity to celebrate six of his yearly Zoroastrian religious feasts, telling him he had to choose just one. He alleges that inmates of other faiths are permitted to have weekly services, while he is only permitted one out of six feasts per year.

Plaintiff's claims are insufficiently pled. "In order for an individual to be liable under §1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (citing Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)). Plaintiff provides a list of defendants under the claim "Retaliation. Denial of First Amendment Rights," and merely states that he was denied the right to have six feasts per year. Not only has plaintiff failed to even allege, let alone establish that any of these defendant were personally involved in any violation of his constitutional rights, he has not made the specific showing required to demonstrate that but for his protected conduct in practicing his Zoroastrian religion, he would not have been subjected to the alleged retaliatory act of these defendants. See Huang, 902 F.2d at 1140. He has provided no information as to how these defendants denied his First Amendment right to practice his chosen religion. Plaintiff has not even attempted to meet his burden of persuasion under 42 U.S.C. §2000cc-2(b), necessary to demonstrate that any WVDOC policy or practice substantially burdens his exercise of religion. Because he has not done so, the court is not

required assess whether the burden was "substantial." 42 U.S.C. §2000cc-2(b), and this claim, like his others, fails, and should be dismissed.[42]

## F. 28 U.S.C. § 1915(g) Three Strikes Rule

Finally, plaintiff's allegations, in addition to being so insufficiently pled that they are as the defendants accurately described them, "threadbare recitals of elements of a cause of action supported by conclusory allegations . . . not entitled to the presumption of truth." Plaintiff's allegations regarding the defendants' deliberate indifference; failure to protect; denial of the right to self-defense; negligence; unjust punishment; retaliation; disclosure of confidential information; denial of his First Amendment right to practice his religion; and interference with a parole decision, with his mail, with the money in his inmate trust account, and with the filing of his administrative remedies are not only impossible to give any credence to, even a cursory review of the record indicates that they are also frivolous and malicious.

Accordingly, plaintiff is again warned that pursuant to 28 U.S.C. §1915(g) he will not be granted *in forma pauperis* status in the future, if he has "on 3 or more prior occasions, while

---

[42] Plaintiff elevates the routine, weekly religious services or Bible studies that inmates of other faiths participate in, with the apparently lavish communal feasts practiced by those of the Zoroastrian faith six times a year. A weekly religious service is not a religious feast. Moreover, plaintiff's claim in this regard begs the question how a lone inmate could actually have a valid Zoroastrian communal feast when he has no other fellow Zoroastrian to share it with him:

> Gahambars/gahanbars are six seasonal festivals or high feasts when Zoroastrians assemble to eat and share food communally. They are joyous occasions at which rich and poor met together, new friendships are formed and old disputes resolved. While each Gahambar traditionally spans five days, nowadays it is the last day that is usually observed. The Gahambars are the only festivals mentioned in the Zoroastrian scriptures, the Avesta . . . Gahambars are a demonstration of beliefs, principles and values in action and are an expression of piety in thought, word and deed. Next to Nowruz, Gahambars are festivals of special significance for Zoroastrians.

> The food stuffs are contributed anonymously according to a person or family's means. Many community members volunteer to prepare the food, prepare for the occasion and serve the meals - without regard to status. **During the meal, everyone sits together and partakes of the same food. The customs are an expression of egalitarian communal togetherness. The free and equal sharing of food with everyone, the environment of togetherness, goodwill and sharing - all serve to help build and strengthen the community.**

See http://www.heritageinstitute.com/zoroastrianism/gahambar/ (emphasis added).

incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." The instant case will be the third filed by plaintiff in this district that has been dismissed or recommended for dismissal for the failure to state a claim and as frivolous.[43]

## IV. <u>Recommendation</u>

For the reasons stated above, the undersigned hereby recommends that the defendants James Colombo, Carol Greene, Benita Murphy, Brenda Stucky, Joseph Thornton's Motion for Summary Judgment (Dkt.# 15) be **GRANTED,** and that defendants Ryan Addams, Robert Flesher, Dale Griffith, Jennifer Hayes, Shirley Heverner, Joanie Hill, Brandy Miller, Russ Powell, Karen Pszczolkowski, Jim Rubenstein, Robert Simsa's Motion to Dismiss (Dkt.# 17) be **GRANTED** and plaintiff's complaint be **DENIED and DISMISSED with prejudice, as frivolous, malicious, and for the failure to state a claim upon which relief can be granted**.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by October 6, 2015**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. §636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

---

[43] The other two are: Case No. 5:15cv51, a mandamus action, which was dismissed on June 29, 2015 as frivolous and for the failure to state a claim upon which relief can be granted, and Case No. 5:15cv150, a civil rights action pursuant to 42 U.S.C. §1983, which was recommended for dismissal on August 3, 2015 as frivolous and for failure to state a claim upon which relief can be granted.

The Clerk is also directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected in the docket sheet, and to transmit a copy electronically to all counsel of record.

DATED:  September 22, 2015

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE